# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| BARRY MILLER, ) | |
| ) | |
| Plaintiff, ) | Case No. 2:08CV00026 |
| ) | |
| v. ) | **OPINION** |
| ) | |
| MICHAEL J. ASTRUE, ) | By: James P. Jones |
| COMMISSIONER OF ) | Chief United States District Judge |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

*Joseph E. Wolfe, Wolfe, Williams, Rutherford & Reynolds, Norton, Virginia, for Plaintiff; Taryn Jasner, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Barry Miller filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act ("Act"), 42 U.S.C.A. §§ 401-433 (West 2003 & Supp. 2008). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, the court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation and citation omitted). It is not the role of this court to substitute its judgment for that of the Commissioner, as long as substantial evidence provides a basis for the Commissioner's decision. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The plaintiff protectively filed for DIB on April 20, 2006, alleging disability beginning April 8, 2006. (R. at 19, 90-127.) The plaintiff claimed disability by reason of degenerative joint disease in his knee and vertabrae, hypertension, and pain and stiffness in his legs. (R. at 93-94.) His claim was denied initially on June 12, 2006, (R. at 59, 65-69, 133), and upon reconsideration on October 25, 2006, (*see* R. at 19). At his request, the plaintiff received a hearing before an administrative law judge ("ALJ") on July 10, 2007. (R. at 19, 38.) At that time, a vocational expert and the plaintiff, who was represented by counsel, testified. (R. at 19, 38-58.) By

decision dated August 30, 2007, the ALJ denied the plaintiff's claim for DIB. (R. at 19-28.)

The plaintiff filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council ("Appeals Council"), but his request was denied on April 17, 2008. (R. at 5-8.) Thus, the ALJ's opinion dated August 30, 2007, constituted the final decision of the Commissioner. The plaintiff then filed his Complaint with this court on May 22, 2008, objecting to the final decision of the Commissioner.

The parties have filed cross motions for summary judgment and have briefed the issues. The case is now ripe for decision.

II

The summary judgment record reveals the following facts. The plaintiff was fifty-three years old when the ALJ made his decision, making him a person closely approaching advanced age under the Commissioner's Regulations. *See* 20 C.F.R. § 404.1563(d) (2008). He finished the eleventh grade, and he received his GED in 1997 or 1998. (R. at 44, 101.) He worked as a heavy equipment operator for various coal companies for approximately twenty-eight years. (R. at 45, 113-14.) He claims

disability due to degenerative joint disease in his knee and vertabrae, hypertension, and pain and stiffness in his legs. (R. at 93-94.)

The plaintiff visited James W. Denton, M.D., on April 25, 2005, with symptoms of an umbilical hernia. (R. at 167.) Otherwise he was "in fairly good health." (*Id.*) The hernia was reduced during the office visit, and the plaintiff indicated that he would call when it was convenient for him to have the hernia repaired. (*Id.*) Dr. Denton saw the plaintiff again on June 30, 2005, at which time the plaintiff indicated that he wanted to have surgery to repair symptoms of the right inguinal hernia. (R. at 166.) Dr. Denton performed surgery on the plaintiff at Johnston Memorial Hospital on July 5, 2005. (R. at 144.) At a followup visit on July 11, 2005, Dr. Denton removed the sutures and noted that there was no fascial weakness. (R. at 164.) Dr. Denton predicted that the plaintiff would be able to return to his job as a heavy equipment operator in four to six weeks. (*Id.*) On August 1, 2005, Dr. Denton noted that the plaintiff had "no complaints and seem[ed] to be doing well at home" and appeared to have a "nice repair with no fascial defects." (R. at 160.) The plaintiff was released to go back to work the following week. (*Id.*)

Andrew Rhinehart, M.D., treated the plaintiff for hypertension, hyperlipidemia, and other medical problems on July 27, 2005. (R. at 161.) Dr. Rhinehart noted that the plaintiff had intermittent pain in his left knee. (*Id.*) Dr. Rhinehart listed the

following diagnoses: hypertension, hyperlipidemia, osteoarthritis, gout, and gastroesophageal reflux disease ("GERD"). (R. at 162.) On September 1, 2005, Dr. Rhinehart conducted a followup visit to review the plaintiff's hypertension medication. (R. at 157.) Dr. Rhinehart noted that the plaintiff had several other ailments, including hyperlipidemia, osteoarthritis, gout, GERD, and allergic rhinitis. (*Id.*)

Laboratory tests in July, September, and October of 2005 showed that the plaintiff had high glucose levels. (R. at 169, 175, 177.) At some point, Dr. Rhinhart referred the plaintiff to a diabetes education program, which he attended on October 6, 2005. (R. 152.) Dr. Rhinehart treated the plaintiff for bronchitis on October 11, 2005. (R. at 155-56.) Dr. Rhinehart again noted that the plaintiff had several other ailments, including hypertension, hyperlipidemia, osteoarthritis, gout, GERD, allergic rhinitis, and pre-diabetes. (R. at 156.)

On November 9, 2005, Dr. Rhinehart diagnosed the plaintiff with left calf strain. (R. 154.) The plaintiff reported that he awoke the morning of November 6, 2005, with pain in his left calf. (*Id.*) Dr. Rhinehart performed a physical exam, and noted that the plaintiff had full range of motion in his knee and ankle, although there was some crepitus in the knee and he was "mildly tender" in the mid calf region. (*Id.*)

Dr. Rhinehart prescribed Mobic for eight days and heat and ice treatment, and told the plaintiff to call if he got worse or was not improving. (*Id.*)

On December 4, 2005, the plaintiff went to the Emergency Department of Johnston Memorial Hospital complaining of chest and leg pain. (R. at 181.) Several tests were performed, including a CT scan, X rays, an ultrasound, and lab analyses on blood samples. (R. at 196-215.) John Ray, M.D., noted that on examination, the plaintiff appeared healthy, but a spiral CT showed bilateral pulmonary emboli. (R. at 186.) The plaintiff was diagnosed with bilateral pulmonary embolism, deep venous thrombosis in the left lower extremity, antiphospholipid antibiotic positive, gout, and flare of the left knee. (R. at 184.) Joe Rupe, M.D., elaborating on the gout diagnosis, noted that the plaintiff had marked swelling and pain in his left knee. (R. at 185.) An orthopedist aspirated the knee and injected it with steroids. (*Id.*) Dr. Rupe wrote, "The patient will utilize a walker to help with pain and with weightbearing at home and will continue ibuprofen as needed for pain. He will be given 25 mg Lortab without refills." (*Id.*) Ray noted that the gout "seem[ed] stable." (R. at 188.) Dr. Richard Mullens, M.D., concluded that the plaintiff had a large joint effusion in the left knee. (R. at 195.) The plaintiff was discharged from the hospital on December 9, 2005. (R. at 184.)

On January 11, 2006, Timothy G. McGarry, M.D., examined the plaintiff. (R. at 216.) Dr. McGarry wrote to Dr. Rupe that it was his impression that the plaintiff had "[a]cute gouty flare with mild left knee synovitis, currently doing better." (*Id.*) Dr. McGarry indicated that he apprised the plaintiff of various treatments and therapies. (*Id.*) Dr. McGarry wrote, "Citing the fact that he feels like he is doing better, [Mr. Miller] wants to continue to wait and watch, and I think that is perfectly fine. I gave him my card today and advised him if he has any worsening problems in the knee to call me, and I will be happy to see him back at any time." (*Id.*)

The plaintiff started regular outpatient office visits as part of his long term use of Coumadin to prevent blood clots and to evaluate his hypertension. (R. at 219-59.) The administrative record includes records of visits with Raymond Bishop, M.D., Tammie McGlothlin, LPN, or Allyson Fields, LPN, once per week from December 12, 2005, to May 17, 2006.[1] (*Id.*) The records for most of these visits note that the plaintiff's medical history included deep venous thrombosis, hyperlipidemia, hypertension, pulmonary embolism, GERD, gout, type 2 diabetes, and allergies. (*Id.*) On January 9, 2006, the plaintiff was taking Allopurinol for gouty arthropathy and

---

[1] These visits were on December 12, 2005; December 19, 2005; December 27, 2005; January 3, 2006; January 9, 2006; January 16, 2006; January 20, 2006; January 30, 2006; February 6, 2006; February 13, 2006; February 20, 2006; February 27, 2006; March 6, 2006; March 10, 2006; March 13, 2006; March 17, 2006; April 5, 2006; April 24, 2006; May 1, 2006; May 11, 2006; and May 17, 2006. (R. at 219-59.)

had five refills remaining. (R. at 253.) On January 16, 2006, the plaintiff was taking Prednisone for gouty arthropathy, but was not prescribed refills. (R. at 249-50.) On March 17, 2006, Dr. Bishop ordered a therapeutic diagnostic injection for the plaintiff's gouty arthropathy. (R. at 228.)

On January 9, 2006, Dr. Bishop noted that the plaintiff "has been experiencing possible adverse medication effects, including flair of gout since starting accuretic." (R. at 251.) But on March 6, March 10, March 13, April 5, and April 24, 2006, Dr. Bishop indicated that although the plaintiff had not kept a blood pressure diary,[2] "[h]e is tolerating the medication well without side effects." (R. at 222, 224, 229, 232, 235.)

In May 2006, a medical expert for Disability Determination Services, Richard Surrusco, M.D., reviewed the plaintiff's medical file and completed a physical Residual Functional Capacity ("RFC") assessment. (R. at 307-13.) Dr. Surrusco listed the plaintiff's primary diagnosis as degenerative joint disease, his secondary diagnosis as deep venous thrombosis, and "other alleged impairments" as hypertension, hernia, gout, pulmonary embolism, GERD, antiphospholipid sx, and hyperlipidemia. (R. at 307.) Dr. Surrusco reviewed the plaintiff's medical records

---

[2] The plaintiff's medical history includes one hand-written blood pressure diary for Barry Miller dated March 17, 2006, to March 27, 2006. (R. at 300.)

- 8 -

and self-reported daily activities and concluded that the plaintiff could lift 20 pounds occasionally and 10 pounds frequently, stand or walk or sit for six hours in an eight-hour workday with normal breaks, and push and pull. (R. at 308.) He noted that the plaintiff should avoid all exposure to hazards such as machinery or heights. (R. at 310.)

After the plaintiff's claim for DIB was denied initially on June 12, 2006, and upon reconsideration on October 25, 2006, he returned to Dr. Bishop for additional followup treatment. The ALJ considered medical records from these monthly visits from January 10, 2007, to July 6, 2007.[3] (*See* R. at 26.) Most of these records are nearly identical to those from the plaintiff's weekly visits to Dr. Bishop's office in 2006, but on March 9, 2007, Dr. Bishop added:

> In regard to [the plaintiff's] back pain, the discomfort is most prominent in the lower lumbar spine. This radiates to the left anterior and posterior thigh. This is a chronic problem, with essentially constant pain. He states that the current episode of pain started more than 10 years ago. He does not recall any precipitating event or injury. He denies numbness in the legs.

(R. at 318.) Dr. Bishop diagnosed the plaintiff with a "likely strain on top of spinal stenosis" and prescribed Robaxin, a muscle relaxant. (R. at 320.)

---

[3] These visits were on January 10, 2007; March 9, 2007; April 30, 2007; May 8, 2007; and July 6, 2007. (R. at 315-25.)

- 9 -

The evidence in this case also includes the plaintiff's testimony regarding his subjective claims and his activities of daily living. The plaintiff testified that he was no longer able to operate heavy equipment such as bulldozers, high lifts, and motor graders, as he had in the past, because "I get so stiff I can't move my back and lower back pain and legs are bothering me [so] that I can't really function to do it safely without hurting someone else." (R. at 45.) He testified that on his last week of work in April of 2006, he had to have someone help him onto and off of the machinery and help him back to his personal vehicle. (*Id.*) His wife helped him get out of his vehicle once he returned home. (R. at 46.) He missed two or three days of work per week during that last month due to doctors' appointments to treat his high blood pressure and gout. (*Id.*)

The plaintiff described pain in his lower back and left hip. (R. at 47.) He testified that he felt sharp pain in his back once or twice per week, at which time his legs would "go out from under" him and he could not stand. (R. at 46.) At times he could not get up or down, move, climb, or lift. (*Id.*) He had constant dull aching pain, so he could not get comfortable in any position sitting, standing, or lying down. (R. at 47.) Sharp pain, when it occurred, would last about thirty minutes or longer. (R. at 46.)

The plaintiff also described his gout, which he had developed in his left knee several times during the previous two years. (R. at 48.) He testified that his first experience with gout left him bedridden for close to three months, during which time he sometimes used a cane, a walker, or a wheelchair to get around. (R. at 49.) Since the gout attacks started, he had been in continuous pain. (R. at 48.) He testified, "The knee pops and sometimes it wants just to give away as I walk or . . . if I stand for a very long period of time, maybe over 10 minutes." (*Id.*) As a result, he had fallen while mowing the grass. (*Id.*) He testified that at the time of the hearing, he had problems with gout once or twice per month, at which time he would have to remain seated or lying down comfortably for two or three days and could not walk without a walker. (R. at 49-50.) The plaintiff testified that gout caused him intense pain in the affected area. (R. at 51.) He took Prednisone for gout, and "within a couple of days, most of the time the prednisone will clear it back up." (R. at 52.)

When describing his hypertension, the plaintiff noted that he had recently started taking Lotrel, and his blood pressure was "the best it's been in the last year and a half." (R. at 52.)

The plaintiff testified that in a normal day, he would wake up, take his medications, and walk about 100 feet to pick up the daily newspaper. He said, "if I'm able to get around good enough, I'll try to help my wife do housework, maybe do

Case 2:08-cv-00026-JPJ-PMS   Document 24   Filed 04/28/09   Page 11 of 20   Pageid#: 62

dishes or do a little housecleaning if I can, try to mow the grass when I can. The times I'm not able to do it, I'll start and she'll end up having to help me finish it." (R. at 52.) He was able to mow the lawn for about twenty minutes at a time before stopping to rest. (R. at 52-53.) In a typical day he would also sit with his elderly mother-in-law. (R. at 53.)

Following the plaintiff's testimony, a vocational expert, Dr. Sandra Wells-Brown, testified regarding the plaintiff's past work experience. She classified the plaintiff's past work as a heavy machine operator as skilled medium to heavy work and said that skills from that occupation were not transferrable. (R. at 55.)

The ALJ then asked Dr. Wells-Brown about jobs available for a hypothetical individual of the same age, experience, educational background, and RFC as the plaintiff. The ALJ described the plaintiff's RFC as being identical to Dr. Surrusco's assessment, and gave Dr. Wells-Brown an opportunity to review that assessment. Dr. Wells-Brown indicated that someone with that level of RFC could do limited light work. (R. at 55.) The hypothetical individual would be precluded from the plaintiff's past work. (R. at 56.) But Dr. Wells-Brown opined that there was other work that such a person could do, such as assembly at the unskilled light level, of which there were approximately 358,000 jobs nationally and 9,100 in Virginia. (*Id.*) He could also work as a cashier at the unskilled light level. Adjusting for postural limitation

- 12 -

required for this individual, Dr. Wells-Brown concluded that there were 500,000 such jobs nationally and 20,000 in Virginia. (*Id.*) A third possible job would be driving at the unskilled light level, of which there were 160,000 jobs nationally and 3,300 in Virginia. (*Id.*) This was a representative, not an exhaustive list of possible occupations available to the hypothetical individual. (*Id.*)

The ALJ then asked Dr. Wells-Brown whether the same hypothetical person would have any job opportunities if he were subject to the additional limitations the plaintiff alleged in his testimony. (*Id.*) These additional limitations would include restrictions in his abilities to sit, stand, walk, lift, and carry. (R. at 56-57.) The individual would have pain to the same degree, frequency, and duration as described in the plaintiff's testimony. (R. at 57.) He would also have periodic pain in his knees, arthritis, and gout such that he would have to use a walker and lose the bilateral use of his hands for a period of time. (*Id.*) Dr. Wells-Brown opined that such an individual would be precluded from doing any work. (*Id.*)

In addition to the evidence above, the administrative record includes a letter to the Appeals Council from the plaintiff's attorney dated January 11, 2008, which included an attached medical assessment of the plaintiff's ability to do work-related activities. (R. at 10-12.) Angela Hunsucker, FNP, completed the two-page assessment form on January 8, 2008. (R. at 12.) In denying the plaintiff's request for

a review, the Appeals Council indicated that it looked at Ms. Hunsucker's assessment, but that the ALJ decided the plaintiff's case through August 30, 2007. "This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before August 30, 2007." (R. at 6.)

III

The plaintiff bears the burden of proving that he is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d)(2)(A).

The Commissioner applies a five-step sequential evaluation process in assessing DIB claims. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, whether he could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). If it is

determined at any point in the five-step analysis that the claimant is not disabled, then the inquiry immediately ceases. *See id.*; *Bowen v. Yuckert*, 482 U.S. 137, 141-42 (1987). The fourth and fifth steps in this inquiry require an assessment of the claimant's RFC, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *See* 20 C.F.R. §§ 404.1560(b)-(c), 416.960(b)-(c).

My review is limited to a determination of whether there is substantial evidence to support the Commissioner's final decision and whether the correct legal standard has been applied. 42 U.S.C.A. § 405(g); *see Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). If substantial evidence exists, the final decision of the Commissioner must be affirmed. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. at 401 (quotation and citation omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 642. It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence. It is not the role of this court to substitute its judgment for that of the Commissioner, as long as substantial evidence provides a basis for the Commissioner's decisions. *See Hays*, 907 F.2d at 1456.

The plaintiff contends that the ALJ's decision was not supported by substantial evidence. The plaintiff points out that the vocational expert testified that if the plaintiff were limited to the extent to which the plaintiff testified, there would be no jobs available to him in the national economy. The plaintiff also argues that the ALJ did not consider all of the plaintiff's impairments in deciding whether he was disabled, including his severe and non-severe ailments, and that the ALJ did not adequately explain his evaluation. However, substantial evidence supported the ALJ's decision, and the ALJ adequately explained his evaluation.

The plaintiff correctly points out that the vocational expert testified that if a hypothetical individual of the plaintiff's age, background, and experience was physically limited in the ways in which the plaintiff testified he was limited, such an individual would have no jobs available to him in the national economy. (R. at 57.) But after reviewing the plaintiff's testimony about his daily activities and his physical limitations in detail, the ALJ explicitly found that "the claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible." (R. at 25.) The ALJ concluded:

> The claimant's complaints of pain are exaggerated and . . . although he may have some pain, the pain is not totally debilitating because he mows the grass, walks outside to get the newspaper, performs at least some household chores, helps his wife with housekeeping, including washing dishes, cared for his mother-in-law and drives. His complaints are

> inconsistent with his doctors' records, with objective laboratory studies, and with his physicians' notes regarding his reports to his treating physicians. Although his alleged limitations may cause him to perform tasks more slowly, he is able to perform work with appropriate treatment in an appropriate work setting.

(R. at 26.)

The plaintiff argues that his testimony was credible and supported by the record. In support of this contention, he points out that Dr. Rupe advised him to use a walker once while he was suffering from gout. (R. at 185.) The plaintiff testified to using a walker while he was suffering from gout, which he said happened once or twice per month for two or three days. (R. at 49-50.)

But the plaintiff's medical records indicate that his ailments, including gout, were not totally debilitating. For example, after one of the plaintiff's experiences with gout in December 2005, he told a specialist in January 2006 that he felt like he was doing better and he "want[ed] to continue to wait and watch" before trying various treatment options. (R. at 216.) Also, records of his frequent checkups in 2006 and 2007 usually simply note that the plaintiff was tolerating his hypertension medication without side effects. (R. at 219-59, 315-25.) Those records show only two episodes of gout: one in December 2005, for which he took gout medication in January 2006, (R. at 249-50, 253), and another in March 2006, for which he received an injection in his knee, (R. at 228). In addition, as the ALJ noted, the plaintiff

- 17 -

testified that he was able to do daily activities such as pick up the paper, wash dishes, and occasionally mow the lawn. (R. at 52-53.) It was therefore reasonable for the ALJ to conclude that the plaintiff's pain was not as debilitating as the plaintiff suggested in his testimony.

The ALJ adopted the RFC assessment of the state agency medical consultant, who had reviewed the plaintiff's medical records and self-reported daily activities. (R. at 26.) The ALJ therefore concluded that the plaintiff could perform light work requiring lifting up to twenty pounds occasionally and ten pounds frequently, standing or walking or sitting up to six hours in an eight-hour workday, and an unlimited amount of pushing or pulling, but no work around hazardous conditions such as moving machinery or heights. (R. at 23.) When the vocational expert was presented with this set of RFC parameters, she opined that a person with those limitations and the plaintiff's age, education, and experience could perform unskilled light work. (R. at 55.) This person could work as an assembler, cashier, or driver. (R. at 56.) The ALJ's conclusion that the plaintiff was physically able to do work available in the national economy was therefore supported by substantial evidence in the record.

The plaintiff also argues that the ALJ considered only his severe ailments and did not consider those impairments in combination with his non-severe ailments. In

addition, the plaintiff claims that the ALJ did not adequately explain his evaluation. The ALJ found that three of the plaintiff's impairments, arthritis, deep venous thrombosis, and gout, were "severe" as that term is defined in the Social Security regulations. (R. at 21.) The ALJ found that the plaintiff's diabetes, hypertension, hyperlipidemia, allergies, and GERD were not "severe" and did not impose more than a minimal effect on his functional capabilities. (*Id.*) However, the ALJ's opinion as a whole demonstrates that he considered all of the plaintiff's symptoms from all of his ailments in determining whether the plaintiff was disabled. The ALJ reviewed the plaintiff's medical history in detail, giving attention to treatment provided for severe and non-severe ailments. (R. at 21-23.) Also, the ALJ adopted the RFC assessment of the state agency medical consultant. The consultant considered the effects of all of the plaintiff's ailments, including degenerative joint disease, deep venous thrombosis, hypertension, hernia, gout, pulmonary embolism, GERD, antiphospholipid sx, and hyperlipidema. (R. at 307, 312.) In short, the record shows that the ALJ considered all of the plaintiff's ailments in combination, and the ALJ adequately explained his evaluation.

Accordingly, I find that there is substantial evidence to support the ALJ's decision.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the Commissioner's Motion for Summary Judgment will be granted. An appropriate final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: April 28, 2009

 /s/ JAMES P. JONES
Chief United States District Judge

Case 2:08-cv-00026-JPJ-PMS   Document 24   Filed 04/28/09   Page 20 of 20   Pageid#: 71
- 20 -